**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **JUSTIN KRAGE, et. al.,** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **v.** | * | **Civil Action No.: 5:19-CV-00321-MTT** |
| | * | |
| **MACON-BIBB COUNTY GEORGIA,** | * | |
| **ET AL and BIBB COUNTY SHERIFF'S** | * | |
| **OFFICE,** | * | |
| | * | |
| **Defendants.** | * | |

## PLAINTIFFS' BRIEF OPPOSING DEFENDANT BIBB COUNTY SHERIFF'S OFFICE'S MOTION FOR SUMMARY JUDGMENT

**COME NOW**, Plaintiffs in the above-styled civil action and hereby file this Brief opposing Defendant Bibb County Sheriff's Office's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56, showing this Honorable Court the following:

## I. INTRODUCTION

Plaintiffs filed suit against Macon-Bibb County Georgia (hereinafter "Defendant County"), and the Bibb County Sheriff's Office (hereinafter "Defendant BCSO") to recover unpaid overtime wages for "on-call" time pursuant to the Fair Labor Standards Act (hereinafter "FLSA"), 29 U.S.C. §201 *et. seq.*, and to recover unpaid "on-call" ("stand-by") wages pursuant to Sections 6.06 and 7.05 of the Macon-Bibb County Government Policies and Procedures Manual (adopted on December 31, 2013) ("the Manual").

Plaintiffs file this brief in opposition to Defendant BCSO's Motion for Summary Judgment. Because questions of fact exist surrounding the restrictiveness of Plaintiffs' on-call obligations, as well as the existence of a contract between Plaintiffs and Defendant BCSO/Sheriff Davis, dismissal of this case is not warranted as a matter of law, and is best left as a question before a jury.

## II. STATEMENT OF FACTS

At all pertinent times herein, Plaintiffs were employed as detectives and investigators by the Bibb County Sheriff's Office ("BCSO") and worked in the Traffic Fatality Unit ("TFU").  As will be shown in more detail below, all Plaintiffs were required to work "on-call" as a condition of their employment with Defendant BCSO, such that their stand-by time while on-call should be compensated.

Additionally, when a constitutional officer or independently elected official, such as Sheriff Davis, begins his/her term, he/she is given the option to elect to have the employees of his/her office be governed by and subject to the terms of the Manual. Specifically, the officer can either elect to have his/her employees be bound by all of the terms in the Manual, none of the terms of the Manual, or to elect to have their employees bound by some of the terms and exempt others.[1]

When the city and county governments consolidated on January 1, 2014, Defendant County presented Sheriff Davis with the above-mentioned election form regarding his employees, deputies, and investigators. Sheriff Davis selected the option whereby the employees of his office would be "governed by and subject to the terms" of the Manual, except for the sections relating to hiring, discipline, and the Macon-Bibb County Government Employee Problem Solving (grievance) Procedure.[2] This election form was signed by Sheriff Davis on March 18, 2014, in his capacity as the Sheriff of Bibb County.[3] The County Board of Commissioners subsequently granted this request.[4] According to the County's HR Director, at no time has Sheriff Davis submitted a request to opt out of the Manual's "on-call" policy found in sections 6.06 and 7.05.[5] Additionally, there are no other County policies with the

---

1 Plaintiff's Exhibit 1 to Deposition of Alisha Duhart.
2 *Id.*
3 *Id.*
4 Alisha Duhart Dep. 17: 5-7.
5 Alisha Duhart Dep. 21, 25: 22-24.

exception of those carved out in the election form that the Sheriff's deputies are not bound by.[6]

Within the Manual, under sections 6.06 and 7.05, there is a defined payment scheme for "on-call" time. This policy states in pertinent part as follows:

> As for compensation for the on-call time, the employee will be paid as though he/she actually worked two hours for each day on which he/she is on-call and four hours for each Saturday, Sunday or Holiday he/she is on-call regardless of whether he/she is actually required to respond to a call.
> The rate of pay for actual work time while on-call shall be in accordance with MBCG pay policy regarding overtime pay. In the event the on-call employee must respond to a call during the on-call time, he/she will be paid for any time actually worked above and beyond the on-call listed above.[7]

Since consolidation, the policies contained in the Manual have been in effect. Despite this fact, Defendant County and Defendant BCSO have willfully failed to compensate Plaintiffs for any of their stand-by time spent on-call, which constitutes a violation of the policies and procedures that Defendant County implemented and Sheriff Davis elected and adopted for Plaintiffs. Defendants have breached this contract and are responsible for Plaintiffs' unpaid overtime wages for "on-call" time pursuant to Sections 6.06 and 7.05 of the Manual.

## III. ARGUMENT AND CITATION OF LAW

Summary judgment is proper when no genuine issue as to any material fact is present and the moving party is entitled to judgment as a matter of law.[8] The movant carries the initial burden and must show that there is "an absence of evidence to support the nonmoving party's case."[9] Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment.[10] The nonmovant is then required "to go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts

---

6 Alisha Duhart Dep. 40: 15-19.
7 Exhibit 4 to the Deposition of Justin Krage p. 111.
8 Fed.R.Civ.P. 56(c).
9 *Shah v. Clark Atlanta University, Inc.*, 1999 WL 1042979 (N.D. Ga. 1999) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554 (1986)).
10 *Shah*, 1999 WL 1042979 at 7 (citing *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991)).

showing that there is a genuine issue for trial."[11]

In the case at bar, the facts show: (1) that this suit should be construed as against Sheriff Davis in his official capacity, (2) that Sheriff Davis is not entitled to Eleventh Amendment immunity, (3) that the Plaintiffs' on-call requirements are sufficiently restrictive so as to entitle them to compensation under the FLSA, and (4) that the provision in the County handbook calling for payment of on-call time created a valid, binding contract between the Plaintiffs and both Defendants.

### (A)   This Suit Should Be Construed As Being Brought Against Sheriff Davis In His Official Capacity

Plaintiffs concede that the Bibb County Sheriff's Office is not an entity that can be sued in federal court. Therefore, this suit should be construed as against Sheriff Davis in his official capacity. A motion to substitute Sheriff Davis for BCSO is being filed contemporaneously herewith.

### (B)   Sheriff Davis Is Not Entitled To Eleventh Amendment Immunity

The function at issue in this case is the payment of "on-call" wages pursuant to the Fair Labor Standards Act ("FLSA"). 29 U.S.C. § 201, *et seq.*, and the payment of "on-call" (stand-by) wages pursuant to Sections 6.06 and 7.05 of the Macon-Bibb County Government Policies and Procedures Manual (the "Manual").[12]   The Bibb County Sheriff's Office contends that it is entitled to summary judgment with respect to Plaintiffs' claims relating to this specific function because, BCSO says, Sheriff Davis acts as an "arm of the State" with respect to this function and is entitled to Eleventh Amendment immunity for any claim relating to it.   The Bibb County Sheriff's Office, however, has not carried it's burden of affirmatively demonstrating the absence of a genuine issue of material fact regarding Sheriff Davis' entitlement to Eleventh Amendment immunity concerning payment of on-call wages.

---

11 *Celotex*, 477 U.S. at 324, 106 S.Ct at 2553.
12 Complaint (Doc. 1), pp. 1-2, ¶ 1.

### 1. Summary Judgment Standard

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[13]  For issues upon which the moving party bears the burden of proof, the moving party must affirmatively demonstrate the absence of a genuine issue of material fact as to each element of its claim.[14] The entity invoking Eleventh Amendment immunity "bears the burden of demonstrating that it qualifie[s] as an arm of the state entitled to share in its immunity."[15]  The Bibb County Sheriff's Office is the entity invoking Eleventh Amendment immunity.   Thus, BCSO must affirmatively demonstrate Sheriff Davis qualifies as an arm of the State on the basis of Eleventh Amendment immunity in order to obtain summary judgment.

### 2. The Eleventh Amendment

The Eleventh Amendment provides immunity by restricting federal court's judicial power:

> The judicial power of the United States shall not be construed to extend to a suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another state, or by Citizens or Subjects of any Foreign State.

U.S. Const., amend XI.

Eleventh Amendment immunity bars suits in federal court when the State itself is sued and when an "arm of the State" is sued.[16]  "To receive Eleventh Amendment immunity, a defendant need not be labeled a 'state officer' or 'state official,' but instead need only be acting as an 'arm of the State,' which includes agents and instrumentalities of the State.   Whether a defendant is an "arm of the State" must be assessed in light of the particular function in which the defendant was engaged when taking actions out of which liability is asserted to arise.   In

---

13 Fed. R. Civ. P. 56(a)
14 *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)
15 *Lange v. Houston County, Georgia* , 499 F.Supp.2d 1259, 67 (M.D.Ga. 2020)
16 *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003).

Eleventh Amendment cases, [the Eleventh Circuit] uses four factors to determine whether an entity is an 'arm of the State' in carrying out a particular function:   (1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity."[17]

Before turning to those factors, two preliminary points merit mention.   First, as the majority in *Manders* repeatedly stressed, the *Manders* factors must be considered 'in light of the particular function in which the defendant was engaged when the actions of which liability is asserted to arise.'[18]   Thus, the question here is not whether the Sheriff Davis acted as an arm of the state 'in some categorical all or nothing manner' but whether he acted for the state 'in the particular function[at] issue today.[19]   That would seem to require a very narrow inquiry. But critics of *Manders* argue that the practical application of the *Manders* factors has resulted, as the dissenting judges warned, in a 'blatant end-run around our function-by function approach.'[20]

"Second, and of fundamental importance here, the Sheriff's Office bears the burden of proving that its affirmative defense of sovereign immunity requires dismissal of [the claimant's] claims for damages against [Sheriff Davis] in his official capacity.   As Judge Anderson put it in his *Manders* dissenting opinion (albeit not in the context of the standard of review), 'the proper question is whether the sheriff has carried his burden of proving that he is an arm of the state."[21]

---

17 *Id.* at 1308-09. *Lange.* 499 F.Supp.2d at 1266-67.
18 *Manders*, 338 F.3d at 1309

19 *Id.* at 1309, n. 9 (quotation marks and citations omitted).
20 *Id.* at 1334 (Barkett, J. dissenting).

21 *Id.* at 1331 (Anderson, J., dissenting)." *Lange*, 499 F.Supp.2d at 1267-68.

**(a) The First *Manders* Factor – How State Law Defines the Entity**

Even though it has the burden of proving that Sheriff Davis is an arm of the State with respect to the particular function at issue in this case,[22] BCSO has not cited any evidence or otherwise shown that he is. *See* Bibb County Sheriff's Office's Amended Brief in Support of Motion for Summary Judgment, pp. 12-14. Nor has it shed any light on the application of the *Manders* factors. *Id.* Nonetheless, Plaintiffs acknowledge that Eleventh Circuit precedent supports a finding of Eleventh Amendment immunity as to the first *Manders* factor – how state law defines the entity. "As the Eleventh Circuit has noted, 'sheriffs in Georgia derive their power and duties from the State, are controlled [as to certain functions] by the State, and counties cannot, and do not, delegate any law enforcement power or duties to sheriffs.'"[23]

**(b) The Second *Manders* Factor – the Degree of Control the State Maintains over the Entity**

Again, despite having the burden of proving that Sheriff Davis is an arm of the State with respect to the payment of on-call wages, the BCSO has not cited any evidence or otherwise shown the degree of control the State maintains over him concerning this specific function.

The Bibb County Sheriff's Office cites *Kicklighter v. Goodrich*, 162 F.Supp.3d 1363 (S.D. Ga. 2016) for the proposition that Eleventh Amendment immunity protects one sued in his or her official capacity for compensation and for damages under the FLSA. Bibb County Sheriff's Office Amended Brief in Support of Motion for Summary Judgment, p. 14, n 7. But *Kicklighter* was the "blatant end-run around our function-by-function approach" that the *Manders* critics and dissenting judges warned about.

---

22 Again, the particular function at issue in this case is the payment of "on-call" wages pursuant to the FLSA and or the Manual
23 *Lange*, 499 F.Supp.2d at 1267-68.

In *Pelliterri v. Prine*, 776 F.3d 777 (11th Cir. 2015), the Sheriff of Lowndes County fired one of his deputies.   The deputy sued alleging that the Sheriff violated her rights under 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964, and the Americans with Disabilities Act, 42 U.S.C. §§ 12111.   The Sheriff then filed a motion to dismiss in which he argued that the deputy sheriff's claims against him in his official capacity were barred by the Eleventh Amendment.   The Sheriff argued that he acted as an "arm of the State" when performing the function of hiring and firing deputies.   The Eleventh Circuit agreed.[24]   But it did so only after a detailed showing of why each *Manders* factor, especially the degree of control the State maintains over the Sheriff's ability to hire and fire deputies (*see Pelliteri* 778 F.3d 780-782), was made.

In *Kicklighter*, however, the party invoking Eleventh Amendment immunity (the Clerk of the Superior Court of McIntosh County) did not provide any evidence or make any detailed showing about any of the *Manders* factors (including the degree of control the State maintains over the Clerk's Office about functions at issue).   Rather, the Court just said that the function of hiring and firing of employees and the function of compensation are treated as one for purposes of the *Manders* inquiry.   Thus, because it had been determined that Eleventh Amendment immunity applied to claims for hiring and firing employees, the Court concluded that FLSA claims and claims for compensation were barred as well.   But, as noted in *Lange*, the question here is not whether the Sheriff's Office acted as an arm of the state "in some categorical all or nothing manner,' but whether it acted for the state "in the particular function at issue today."[25]

As the Clerk did in *Kicklighter*, the Bibb County Sheriff's Office wants to do an end-run around the function-by-function approach here.   But just because Sheriff Davis may have

---

24 *Pelliteri*, 776 F.3d at 779.
25 *Lange*, 499 F.Supp.3d 1258 (2020)

8

Eleventh Amendment immunity with respect to some other employment-related functions, such as hiring and firing, does not mean the Eleventh Amendment immunity exists with respect to other employment-related functions, such as the payment of "on-call" wages pursuant to the FLSA, or the payment of "on-call" wages pursuant to the Manual.   A function-by-function approach must be used and the *Manders* factors must be applied to each function.

The 11th Circuit's unpublished decision in *Keene v. Prine*[26] highlights just how important the second factor is.   There, in contrast to the analysis in *Pelliteri*, the court determined that sheriffs are largely independent from the State when making day-to-day personnel decisions, such as terminations.[27]   The *Keene* court reached the same conclusion as the *Pelliteri* court with respect to the other three *Manders* factors, but because of lack of control by the State over the particular function at issue, Eleventh Amendment immunity was not granted.

In the present case, the BCSO has failed to show the degree of control the State exercises over Sheriff Davis with respect to the payment of on-call wages.   It has not sufficiently applied all four *Manders* factors with respect to this particular function. Accordingly, it has failed to affirmatively demonstrate the absence of a genuine issue of material fact on the question of the degree of control the State exercises over Sheriff Davis. Further, having invoked the Eleventh Amendment, the Bibb County Sheriff's Office "bears the burden of demonstrating that it qualifie[s] as an arm of the state entitled to share in its immunity."[28]   The BCSO has not attempted to do that either.   As a result, BCSO has not carried its burden and affirmatively shown that there is no genuine issue of material fact with respect to the second *Manders* factor.   For that reason alone, the Bibb County Sheriff's Office is not entitled to summary judgment.

---

26 477 F.App'x 575 (11th Cir. 2012)
27 *Id.* at 576-7
28 *Lange*, 499 F.Supp.2d at 1267

### (c)   The Third *Manders* Factor – Where the Entity Derives its Funds

As to the third *Manders* factor – where the Bibb County Sheriff's Office gets its funding for the function at issue – the Eleventh Circuit has held that this factor does not weigh against immunity because: (1) state law requires counties to fund sheriff's offices and (2) counties cannot dictate how the funds are spent.[29]   Similarly, the County cannot dictate how the Bibb County Sheriff's Office spends its funds.   Accordingly, this factor does not weigh for or against immunity."[30]   As a result, it does not affirmatively demonstrate the absence of a genuine issue of material fact and does not entitle BCSO to summary judgment.

### (d)   The Fourth *Manders* Factor – Liability for and Payment of Adverse Judgments

In *Hess v. Port Authority Trans-Hudson Corporation*,[31] the United States Supreme Court placed great weight on the fourth *Manders* factor, describing it as the "impetus for the Eleventh Amendment: the prevention of federal-court judgments that must be paid out of a State's treasury."[32]   "In Georgia, as a general matter, 'neither the State nor the County will be required to directly pay for any adverse judgment against the Sheriff's office.'[33] Typically, therefore, this factor weighs against [Eleventh Amendment] immunity."[34]   If the State treasury will not be implicated in either the defense of the Sheriff or in the payment of judgments against him (as is the case here), the Sheriff should not be viewed as an arm of the State unless, pursuant to the second factor, he is acting as a mere conduit for the ministerial enforcement of a State court order or State law (which is not the case here). As a result, the fourth factor does not support summary judgment in favor the Bibb County Sheriff's Office.

---

29. *Pellitteri*, 776 F.3d at 782
30. *Lange*, 499 F.Supp.3d at 1268-1269
31  513 U.S. 30 (1994)
32  *Id.* at 48
33  *Lange*, 499 F.Supp.3d at 1268-1269
34  Id.

### 3. Summary

This case is before the Court on the Bibb County Sheriff's Office Motion for Summary Judgment and the Bibb County Sheriff's Office bears the burden proving that it is entitled to Eleventh Amendment immunity.   Thus, BCSO must affirmatively demonstrate the absence of a genuine issue of material fact with respect to each *Manders* factor over the specific function at issue in this case.   While the first Manders factor could support a finding that Sheriff Davis is an arm of the State, BCSO has not affirmatively demonstrated the absence of a genuine issue of material fact with respect to the remaining three *Manders* factors regarding the function at issue in this case.   Having invoked the Eleventh Amendment, the Bibb County Sheriff's Office "bears the burden of demonstrating that it qualifie[s] as an arm of the state entitled to share in its immunity."[35]   BCSO has failed to meet its burden to show that that there are no genuine issues of material fact with respect to all *Manders* factors as to whether Sheriff Davis is acting as an arm of the State with respect to payment of on-call wages.

**(C)   Plaintiffs Are Entitled To Compensation Under The FLSA For "Stand-by" Time Spent On-Call Because They Are Severely Restricted During That Time**

In its Motion, Defendant BCSO correctly directs this Court's attention to 29 C.F.R. §553.221(d) and 29 C.F.R. §785.17, which lay out the instances during which Plaintiffs may be entitled to on-call pay under the FLSA. However, the pertinent language within 29 C.F.R. §553.221(d) which should be emphasized includes the following: "Time spent on call may or may not be compensable depending on whether the restrictions placed on the employee preclude using the time for personal pursuits," and "(...) where the conditions placed on the employee's activities are **so restrictive that the employee cannot use the time effectively for personal pursuits**, such time spent on call is compensable (emphasis added)."[36] Additionally, the Plaintiffs' responsibilities while on-call exceeded the circumstances

---

35 *Lange*, 499 F.Supp.2d at 1267
36 29 C.F.R. §553.221(d).

contemplated in 29 C.F.R. §785.17 in that they are not "merely required to leave word at [their] home or with company officials where [they] may be reached."[37] Rather, the Plaintiffs' responsibilities while on-call far exceed simply having to leave word about where they will be once they leave their employer's premises.

The question of whether the employees were working during stand-by on-call time for purposes of the FLSA depends on the degree to which the employee may use that time for personal activities.[38] This has been formulated as the "predominant benefit" test, which is used to determine whether time spent on-call is predominately for the benefit of the employer or the employee.[39] In *Martin*, the court found that if an employer calls back an employee so frequently as to make effective personal use of on-call time impractical, or where the on-call system is so distracting or cumbersome as to seriously inhibit personal activities, the policy would constitute a serious interference, and on-call time would be compensable.[40]

The above-mentioned principles have been analyzed by courts, and those courts have been influenced by a variety of different factors in their determination of whether or not the employee's time spent on-call can be effectively used for personal pursuits or is used predominately for the benefit of the employer.[41] Such factors include: (1) the terms of the employment agreement, if any; (2) physical restrictions placed on an employee while on call; (3) the maximum period allowed by the employer between the time the employee was called and the time he or she reports back to work ("response time"); (4) the percentage of calls expected to be returned by the on-call employee; (5) the disciplinary action, if any, taken by the employer against employees who fail to answer calls; (6) the frequency of actual calls

---

37 29 C.F.R. §785.17.
38 *Birdwell v. City of Gadsden, Ala.*, 970 F.2d 802, 807 (11th Cir. 1992).
39 *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944).
40 *Martin v. Ohio Turnpike Commision*, 968 F.2d 606 (6th Cir. 1992).
41 *Birdwell v. City of Gadsden, Ala.*, 970 F.2d at 807.

during on-call periods; *and* (7) the actual use of the on-call time by the employee.[42] While these factors are not all encompassing, the Plaintiffs contend they are helpful to the determination of the compensability of their on-call time.

An analysis of the deposition testimony of the Plaintiffs and their supervisors provides helpful insight into how their time spent on-call fits into the factors mentioned above.

**1. The terms of the employment agreement, if any.**

When determining the compensability of time spent on-call, an important element is whether the employer and employee had a prior agreement governing the compensation of on-call time.[43]

As previously discussed in the statement of facts above, at the time when the former City of Macon and former Bibb County consolidated, Sheriff Davis elected to be bound by the provisions within the Macon-Bibb County Policies and Procedures Manual. In turn, all Plaintiffs from all three cases were required to sign off on the Manual, which marked the beginning of an employment agreement between the parties.[44] The contents of the Manual contained a provision for the payment of "on-call" time, as follows: "As for compensation for the on call time, the employee will be paid their regular hourly rate for two hours for each day on which he/she is on call and four hours for each Saturday, Sunday or Holiday he/she is on call regardless of whether he/she is actually required to respond to a call. On call time is not time actually worked and will not be included when calculating overtime."[45]

---

42 See *Armour & Co. v. Wantock*, 323 U.S. 126 (1944); *Skidmore*, 323 U.S. 134 (1944); *Adair v. Charter County of Wayne*, 452 F.3d 482 (6th Cir. 2006); *Priddy v. City of Kiowa*, 153 F.3d 728 (10th Cir. 1998).
43 See *Skidmore*, 323 U.S. supra at 137 and *Allen v. Atlantic Rich-Field Co.*, 724 F.2d 1131 (5th Cir. 1984) (holding that the trial court properly admitted evidence of an agreement between the parties since such an agreement was a circumstance to consider in determining whether the off-duty time in the plant was spent primarily for the employer's benefit).
44 Hester Dep. 10: 24-25, 11: 1-15; Baker Dep. 24: 18-25, 25: 1-25, 26: 1-3; Thompson Dep. 61: 13-16; Robinson Dep. 61: 8-25, 62: 1-9.
45 Exh. 4 to Krage Dep., p. 111

13

That agreement clearly indicated that the Plaintiffs, who were bound by the Manual, would be paid for a specifically indicated amount of hours while on-call, **regardless of whether he/she is actually required to respond to a call**.[46] By the clear terms of the policy, there was an intention to compensate Plaintiffs in this manner.

2. **Physical restrictions placed on an employee while on call; &**
3. **The maximum period allowed by the employer between the time the employee was called and the time he or she reports back to work ("response time")**

Multiple physical restrictions were placed on the Plaintiffs while they were on-call. For instance, at the beginning of their employment the Plaintiffs were given cell phones by the County, which are used to reach them at all times by whomever is making the call-out.[47] This means that the Plaintiffs have to carry the phone with them everywhere they go.[48] As a result, the on-call Plaintiffs are not able to go any place where they do not have cell phone service (such as a child's school), since they are required to answer every call.[49]

Additionally, the Plaintiffs must report to a call-out "as soon as possible" but no more than one hour.[50] Because the Plaintiffs have to respond to a call-out within one hour, that means they cannot travel anywhere geographically that would potentially put them out of that one hour response time.[51]  For example, this has caused Plaintiffs to miss their children's sporting events and prevented them from being able to go to their hunting land, attend

---

46 *Id.*
47 Robinson Dep. 31: 3-5; Shurley Dep. 45: 25, 46: 1-4, 10-12; McCane Dep. 42: 6-11; Miller Dep. 39: 13-17; Putnam Dep. 38: 19-23; Powell Dep. 50: 10-16, 55: 5-8; Joiner Dep. 49: 17-25; Hester Dep. 30: 1-9; Bridger Dep. 38: 1-14; Vamper Dep. 37: 4-5; Malone Dep. 69: 2-12; Vann Dep. 45: 1-2; Parrott Dep. 49: 8-15.
48 *Id.*
49 Vamper Dep. 35: 18-25; Malone Dep. 69: 2-12; McCane Dep. 45: 5-6; Vann Dep. 45: 1-2; Hester Dep. 30: 1-9; Bridger Dep. 48: 10-14.
50 Krage Dep. 118: 4-7, 129: 11-19; Renfroe Dep. 64: 3-7; Baker Dep. 51: 18-25, 52: 1-23; Robinson Dep.71: 1-18; Thompson Dep. 46: 1-4; Malone Dep. 75: 14-25; McCane Dep. 45: 5-6; Moore Dep. 40: 7-12; Parrott Dep. 49: 8-15; Powell Dep. 57: 22-24; Putnam Dep. 49: 9-12; Shockley Dep. 35: 10-14, 37: 7-22; Shurley Dep. 44: 1-3, Vann Dep. 45: 11-14; Joiner Dep. 49: 2-10; Hester Dep. 30: 1-9; Bridger Dep. 38: 8-14.
51 Krage Dep. 119: 5-20, 125: 25, 126: 1-4, 131: 7-11; Renfroe Dep. 69: 10-20; Baker Dep. 51: 18-25, 1-23; Robinson Dep. 33: 10-25, 35: 2-3, 76: 8-25, 77: 1-9; Vamper Dep. 52: 19-25; Malone Dep. 76: 3-5; McCane Dep. 45: 5-6.

professional sporting events in Atlanta, take their boat out on a lake, obtain a car part in Atlanta, or play in a golf tournament, as well as a multitude of other activities that the Plaintiffs would like to enjoy when they are not on-duty but cannot.[52]

Plaintiffs are also restricted from drinking alcohol while on-call due to the nature of their jobs.[53] This is especially true when the deputies are driving the County vehicles assigned to them. For instance, Plaintiff Krage deposed that he always has to drive his County vehicle to his mother's house in Forsyth Georgia due to the distance and time constraint. As Plaintiff Krage explained,

> In the middle of Thanksgiving dinner, everybody's having wine, having a good time getting together with family from Texas, and I could not touch a drop of alcohol because I have to be on call and there's a zero tolerance alcohol policy for use of these vehicles. And I actually got a call-out, so I had to leave Thanksgiving dinner with relatives from Texas that I rarely ever see, respond down to Macon, handle the crash, and then go back to what was left of Thanksgiving dinner.[54]

The Plaintiffs also have to keep the necessary gear and clothes on them at all times.[55]

In *Skidmore*, cited by Defendant BCSO, the court excluded time the on-call employees spent sleeping and eating because they reasoned that those pursuits "would presumably occupy the employees' time whether they were on-duty or not." However, the court further held that the rest of the time was "different because there is nothing in the record to suggest that, even though pleasurably spent, [the Plaintiffs' time on-call] was spent in the ways the men would

---

52 Krage Dep. 119: 5-20, 129: 11-19, 131: 7-11; Renfroe Dep. 69: 10-20; Baker Dep. 51: 18-25, 52: 1-23, 54: 12-25, 55: 2-10; Bridger Dep. 39: 16-25, 40: 1-4.
53 Thompson Dep. 44: 10-20; Baker Dep. 73: 9-21, 74: 9-11; Parrott Dep. 60: 25, 61: 1-11; Shurley Dep. 50: 4-7; Krage Dep. 121: 10-25; Hester Dep. 30: 1-9; Joiner Dep. 52: 17-18; Putnam Dep. 49: 9-15; Miller Dep. 41: 15-30, 65: 9-25; Shelley Rutherford Dep. 25: 1-3; Fred Carmical Dep. 21: 24-25; Scott Davis Dep. 32: 23-25.
54 Krage Dep. 121: 10-25.
55 Krage Dep. 140: 23-25, 141: 1-14.

have chosen had they been free to do so."[56] Here, even though the Plaintiffs were not required to remain on Defendant BCSO's property while they were on-call, the totality of the physical restrictions placed upon them has nonetheless prevented them from traveling to places they normally would have had they not been on-call, or even doing something as menial as enjoying a drink after enduring a physically and mentally exhausting work day.

These stringent restrictions are distinguishable from other cases where compensation was denied because the physical restrictions were not restrictive enough, for example: in *Norton* the Plaintiffs only had to carry a paging device as opposed to carrying a cell phone which would have restricted them to places with a cell signal;[57] in *Clay*, the Plaintiffs were free to exchange stand-by duty with others without approval of their boss (unlike the Plaintiffs in this case), they only had to carry a pager as opposed to a cell phone, and they received less than one call-out for each twenty-four hour shift;[58] in *Brock*, the Plaintiffs had "great flexibility in scheduling on-call time inasmuch as they may relieve themselves of the on-call obligation whenever they chose to do so," and their call-outs were infrequent, which meant that the for "[t]he majority of the time an employee's on-call duty does not interfere at all with normal activities in and around the home."[59]

**4.   The percentage of calls expected to be returned by the on-call employee; &**
**5.   The disciplinary action, if any, taken by the employer against employees who fail to answer calls**

The Plaintiffs are required to answer one hundred percent of calls they receive while they are on call.[60] If for any reason the Plaintiffs do not answer their phone and they have not

---

56 *Skidmore*, U.S 134 at 139.
57 *Norton v. Worthen Van Service, Inc.*, 839, F.2d 653, 655 (10th Cir. 1988).
58 *Clay v. City of Winona, Mississippi*, 753 F. Supp. 624 (N.D. Miss. 1990).
59 *Brock v. El Paso Natural Gas Company*, 826 F.2d 369, 373 (5th Cir. 1987).
60 Renfroe Dep. 34: 3-7; Robinson Dep. 31: 3-5; Shurley Dep. 46: 10-12; McCane Dep. 42: 6-11, 45: 5-6; Miller Dep. 39: 9-19; Putnam Dep. 38: 5-15; Powell Dep. 50: 10-16; Joiner Dep. 49: 2-10; Hester Dep. 30: 1-9; Bridger Dep. 38: 8-14; Vamper Dep. 37: 4-5; Malone Dep. 69: 2-12; Vann Dep. 45: 1-2; (Sheriff's Deputy Daniel Putman deposed that "[the phone] should be answered no matter what when we're on-call," and Deputy Brian Powell deposed that "if you're on call, you're required to answer [the phone] any time[.]")

previously told the appropriate parties that they are unavailable, they are subject to discipline.[61] Depending on how many times a Plaintiff fails to answer a call, the discipline they potentially face includes a verbal warning, a sit-down meeting, a write up, losing vehicle privileges, or getting fired from their unit.[62]  In contrast, in *Adair* and *Priddy*, where compensation was denied, the employees were never subjected to discipline for failing to respond to a call-out.[63]

The result of this, which overlaps with the factors above, is that the Plaintiffs are at the disposal of their phone every minute of every hour that they are on call, which is 24 hours per day, seven (7) days per week.   Plaintiff Krage deposed that, "if I'm on call, it's a constant is my phone going to ring. I'm spending time with my wife, but I'm attached by a leash. I call that evil cell phone (…) my leash to the radio room because I'm constantly at the beck and call to drop everything and go."[64]  Furthermore, he deposed that if he doesn't respond to a call, "my job's done."[65]

The Plaintiffs are not given an option while on-call as to whether or not they want to answer their phone. They must answer it every single time, which means they could get disciplined for so much as accidentally leaving it in their vehicle for twenty to thirty minutes while at the fair with their family.[66]  In *Jonites* the employees were only required to respond "to at least 35 percent of all calls,"[67] and in *Boehm*, the employees were only required to respond to one-third of all call-outs.[68]  Therefore, the courts denied compensation in those cases.

---

61 Putnam Dep. 56: 2-9; Vann Dep. 38: 24-25, 39: 1-2; Miller Dep. 63: 7-25; Baker Dep. 50: 6-25; Robinson Dep. 73: 23-25; Hester Dep. 30: 10-25.
62 Krage Dep. 119: 24-25, 120: 1-5; Fred Carmical Dep. 23: 5-21.
63 *Adair v. Charter County of Wayne*, 452 F.3d 482 (6th Cir. 2006); *Priddy v. City of Kiowa*, 153 F.3d 728 (10th Cir. 1998).
64 Krage Dep. 125: 3-19.
65 Krage Dep. 120: 5.
66 Miller Dep. 63: 7-25.
67 *Jonites v. Exelon Corporation*, 522 F.3d 721 (7th Cir. 2008).
68 *Boehm v. Kansas City Power and Light Company*, 868 F.2d 1182 (10th Cir. 1989).

### 6.    The frequency of actual calls during on-call periods

Being that Plaintiffs Krage and Renfroe are the only two full-time deputies assigned to the Traffic Fatality Unit, they are both on-call 24/7.[69] On almost every occasion, they are required to work the same scene in order to do their jobs in the fastest, most efficient way, meaning the frequency of their call-outs is high.[70] When they do have to respond to a scene, they are normally present for a minimum of four hours, which means at any given moment while they are on-call, regardless of where they are, they must be ready within an hour's notice to respond to a scene and will typically remain there for hours.[71] This is in addition to calls that the Plaintiffs receive where they do not have to physically respond to the scene, but they are still required to answer the phone and answer questions or provide assistance remotely.[72]

With regard to how often the Plaintiffs receive calls, Plaintiff Krage deposed that on average he and Renfroe get called out 1.2 to 1.6 times per week.[73] But, he also deposed that "last week I had three [call-outs] in four days."[74] However, that number does not include the amount of calls he receives that he does not have to physically respond to but must still handle remotely. Such calls often come from the coroner's office or the public information office where Plaintiff Krage is required to answer questions or get notified of deaths that may result from a crash with which he was involved.[75] The sheer number of those calls is so extensive that Plaintiff Krage was not able to quantify an exact number.[76]

---

69 Renfroe Dep. 31: 34, 57: 13-20; Krage Dep. 65: 20-21, 73: 23-25, 157: 20-22; Scott Davis Dep. 22: 13-22.
70 Renfroe Dep. 30: 6-22; Krage Dep. 45: 5-10, 158: 2.
71 Renfroe Dep. 76: 15-25; Davis Dep. 64: 8-10.
72 Renfroe Dep. 77: 2-7; Krage Dep. 63: 23-25, 64: 1-12, 77: 10-15, 83: 13-20, 127: 23-25, 128: 1-12.
73 Krage Dep. 84: 11-15.
74 Krage Dep. 100: 15.
75 Krage Dep. 127: 1-25, 128: 1-12.
76 Id.

### 7.      The actual use of the on-call time by the employee

The Plaintiffs' on-call time is severely restricted, which is supported by ample testimony from the Plaintiffs, their supervisors, and other sheriff's deputies who are subject to on-call duty. Although the Plaintiffs may physically be "able" to do certain things or go places while on-call, all of the above-mentioned restrictions placed on them prevents them from using their time "effectively," or as they please. The Plaintiffs in all three cases have deposed that in the past they have attempted to do activities that they enjoy while on-call, such as going to dinner with their spouses, playing golf, or even going to the grocery store. However, most if not all of the deputies have gotten call-outs during those times, meaning they have to leave in the middle of dinner, leave their group hanging on the golf course, or leave a cart full of groceries at the store because they do not have enough time to make it home before having to respond to the call-out within that one hour time frame.[77] These examples constitute just a fraction of the activities that are affected by Plaintiffs' on-call schedule, and that they do not engage in now.

Plaintiff Krage explained the following:   any time he wants to go to dinner with his wife on a date night, he has to get prior authorization from his Lieutenant to be outside of the required response time because he's not able to end the dinner and make it to Macon in time, which means he can only have a date night with his wife once every couple of months so they have to just cook at home;[78] he has to try and get his on-call shift covered "for [him] to have any kind of life," which normally occurs only two or three times per month;[79] he "cannot do anything," including taking his boat in the water, going to an Atlanta Braves baseball game, or even going to a movie without prior authorization from his Lieutenant;[80] the military let him

---

[77] Krage Dep. 115: 7-11, 119: 5-20, 137: 1-7.
[78] Krage Dep. 119: 5-20; 125: 3-19.
[79] Krage Dep. 123: 2-13.
[80] Krage Dep. 119: 5-20.

out of his contract due to the restrictiveness of his BCSO on-call schedule;[81] he can't go to the lake with his boat because he could not respond in one hour, nor can he make personal errands such as taking his clothes to/from the dry cleaner;[82] in the past three years he has not once played a round of golf or gone to the shooting range because in order to do so he would have to come off call, which would put more of a burden on Plaintiff Renfroe and their Lieutenant since their Lieutenant wants two people responding to every call-out.[83] This means that because of his on-call responsibilities, Plaintiff Krage has had to sacrifice playing golf, boating, and competitive shooting, all of which were things he enjoyed doing before being bound by the on-call requirements.[84] He further deposed that "I can't enjoy my off time because my off time is not my off time; I'm still owned by the county and Sheriff's Office."[85]

Furthermore, Plaintiff Renfroe's life has been equally restricted by his on-call duties. He deposed the following: his on-call schedule has forced his wife to quit her job;[86] it has limited him from dropping his children off at their grandparents house during the time he is on-call before he goes into work and his ability to pick them up after work;[87] though he used to love going to the movies, he feels that he no longer can because he has previously paid for a movie ticket just to have to leave in the middle of the movie;[88] the amount of times he goes to dinner with his family has decreased because he has to take two vehicles and he can't enjoy it, as well as not being able to go to restaurants that are further than ten to fifteen minutes from his home;[89] his ability to watch his daughter's gymnastics lessons has been impacted;[90] he has to take his work vehicle when visiting his parent's house and drive separately from his wife

---

81 Krage Dep. 117: 2-4.
82 Krage Dep. 129: 11-19, 131: 7-11.
83 Krage Dep. 134: 15-25, 135: 1-25, 136: 1-6.
84 Krage Dep. 128: 11-19; 134: 22-25, 138: 5-21.
85 Krage Dep. 125: 17-19.
86 Krage Dep. 23: 23-24.
87 Renfroe Dep. 55: 10-23.
88 Renfroe Dep. 59: 16-19, 60: 6-18.
89 Renfroe Dep. 68: 15-25, 69: 1-4, 69: 1-20.
90 Renfroe Dep. 69: 10-20, 71: 12-25.

due to the distance;[91] and he feels like he cannot enjoy his hobbies, such as playing multi-person strategy card games with his friends.[92]

Additionally, the Plaintiffs' supervisor, Lieutenant Scott Davis was also deposed, and his testimony highlights the Plaintiffs' need to be compensated for the time they spend on-call. Specifically, Lieutenant Davis testified that the Plaintiffs have to respond to approximately thirty to forty traffic fatality scenes per year.[93] He also deposed that he believes it "makes sense" for the Plaintiffs to have time where they are guaranteed off time,[94] which they have not had during the relevant time period; that he knows the Plaintiffs need rest;[95] that the Plaintiffs need a break so that they can completely cut off from work and spend time with their families or enjoy something as small as a cigar; that there is a mental benefit in allowing them to do so;[96] and that personally, he would have "no qualms" about paying the Plaintiffs for their on-call time.[97]

Defendant BCSO cites to a number of cases in support of its contention that the Plaintiffs' time is not used predominately for the benefit of their employer. However, there are important distinctions between those cases and the one at bar. For example, with regards to the *Bright* case, some notable differences are that when the plaintiff in *Bright* got called out, there was no evidence that those calls ever took him more than two hours and forty minutes to handle.[98]  In the present case, the Plaintiffs deposed that a call-out will take them a <u>minimum</u> of four hours to handle.[99] Therefore, the extensive length of time that Plaintiffs are often required to be at a call-out far exceeds the amount of time the plaintiff in *Bright* testified to.

---

91 Renfroe Dep. 50: 10-25, 50: 1.
92 Renfroe Dep. 61: 18-25, 62: 1-12, 62: 21-25, 64: 1-2.
93 Scott Davis Dep. 16: 20-25, 17:1.
94 Scott Davis Dep. 25: 18-23.
95 Scott Davis Dep. 28: 16-25.
96 Scott Davis Dep. 29: 11-16, 31: 2-5, 38: 7-24.
97 Scott Davis Dep. 37: 11-25, 38: 1-5.
98 *Bright v. Houston Nw. Med. Ctr. Survivor, Inc.*, 934 F.2d 671, 673 (5th Cir. 1991).
99 Plaintiff's Brief p. 10.

Additionally, in *Bright*, the plaintiff was not required to totally abstain from drinking alcohol, he just had to be not so intoxicated that he was unable to work on the medical equipment.[100] Here, the Plaintiffs and their supervisors have deposed that there is a zero alcohol policy, meaning any time they are on-call, they cannot so much as enjoy a glass of whiskey or drink a glass of wine with their wife.[101] The plaintiff in *Bright* also testified that he would often engage in activities away from home, including his "normal shopping" such as at the grocery store and mall, and would "occasionally" go to restaurants to eat.[102] As discussed previously, the Plaintiffs in the present case do not feel as though they can effectively enjoy activities away from their home, and the percentage of time that they go out to eat is minimal.

Also, the plaintiff in *Bright* testified that he was called out two times on average during the week and two to three times on the weekend.[103] Although Plaintiff Krage deposed that he gets physically called out only once or twice a week, that does not include the extensive amount of phone calls that he receives that he handles remotely. Contrary to *Bright*, the Plaintiffs in the present case are unable to use their time effectively for their own purposes based on the frequency of calls, the length of time that the call-outs take, the total amount of days that the Plaintiffs must be on-call, and all of the above-mentioned restrictions placed upon them by Defendant BSCO.

Additionally, Defendant BCSO cited to *Birdwell*, which also has notable differences to the case at bar.   In *Birdwell*, "several" Plaintiffs worked two jobs and no one testified that they could not use their time at home as they wished.[104] Here, neither Plaintiff deposed that he works a secondary job while on-call, but both Plaintiffs deposed that there are a plethora of activities that they feel they are unable to do either at home or away from home while on-call,

---

100 *Bright*, 934 F.2d at 673.
101 Plaintiff's Brief p. 8.
102 Bright, 934 F.2d at 673.
103 *Id*. at 674.
104 *Birdwell v. City of Gadsden, Ala.*, 970 F.2d 802, 808 (11th Cir. 1992).

such as those listed above. There is a major difference between physically prohibiting a certain activity versus the practical implication that the activity cannot be done effectively while on-call.[105] This is the proper test to be applied.

Furthermore, Defendant BCSO cited to *Arrington*, wherein the court found that there was "no indication that the aforementioned officers are subject to frequent calls as were the firefighters in *Renfro* and *Cross* or that they are unable to use their on-call time predominately for their own benefit. The remaining plaintiffs are subject to being on call for varying amounts of time with varying expectations of actually being called. None of the plaintiffs are subject to the onerous restrictions imposed upon the firefighters in *Renfro* and *Cross*."[106] However, the Plaintiffs in the present case are more synonymous to the plaintiffs in *Renfro*, and there is ample evidence that they cannot use their time predominately for their own benefit, but rather, have to stay at home or alter the ways in which they can engage in activities outside of their home.

In *Renfro*, the court held that the district court did not err in denying the defendant's motion for summary judgment based on the following factors: although eleven of the plaintiff firefighters had secondary employment while on-call, that secondary employment was difficult due do the restrictive nature of the on-call status; the plaintiffs had to report to the stationhouse within twenty minutes of being paged or be subject to discipline, the on-call periods were 24-hours in length; of particular importance was the frequency of call-outs, with an average frequency of three to five calls per on-call period but potentially as many as thirteen; the difficulty of trading shifts; the conditions of the on-call status restricted the plaintiffs' personal pursuits even though they were not required to remain on stationhouse premises; plaintiffs were subject to discipline for late or missed calls; the defendant was the primary beneficiary

---

105 Krage Dep. 136: 16-20.
106 *Arrington v. City of Macon*, 986 F. Supp. 1474, 1480 (1997).

of the on-call program; the plaintiffs presented evidence that they were effectively precluded from engaging in group activities or from activities requiring the expenditure of money because they must report within twenty minutes of being called; the nature of the plaintiffs' employment as firefighters was a relevant factor in determining that the on-call time was compensable because they must be alert and ready to protect the community; the time firefighters spend lying in wait for emergencies could be considered a benefit to the employer and thus compensable under FLSA; and since the on-call shifts were 24—hours in length, the sleep and meal times were compensable.[107] Based on all of these factors, the district court held and the court of appeals agreed that the plaintiffs' on-call time was so restrictive of the plaintiffs' personal time that the on-call time was compensable under FLSA.

Furthermore, the *Renfro* court referenced the method for testing whether on-call time is compensable under the FLSA, which is that the United States Supreme Court has stated "an employer may hire a man to do nothing, or to do nothing but wait for something to happen...Readiness to serve may be hired, quite as much as service itself, and time spent lying in wait for treats to the safety of the employer's property may be treated by the parties as a benefit to the employer."[108] Additionally, the Court cited to *Skidmore*, which held that, "no principle of law found either in the statute or in court decisions precludes waiting time from also being working time period we have not attempted to, and we cannot, lay down a legal formula to resolve cases so varied in their facts. Whether... such time falls within or without the act is a question of fact to be resolved by appropriate finding of the trial court."[109]

The factors in the case at bar have many similarities to those in the *Renfro* case. One distinction is the response time requirement, however, being that the *Renfro* court based its decision on a plethora of other factors in addition to the response time requirement, the fact

---

107 *Id.* at 1536.
108 *Renfro v. City of Emporia, Kan.*, 948 F.2d 1529, 1535, 1536 (10th Cir. 1991).
109 *Id.* at 1536, 1537. (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).

that the Plaintiffs have between thirty minutes to an hour to respond should not be dispositive to finding that they should not be compensated. Additionally, although the Plaintiffs in the present case may not get as many physical call-outs as the plaintiffs in *Renfro*, they nonetheless receive many additional calls that require them to remain on their phone for varying amounts of time throughout their 24-hour day. Additionally, the Plaintiffs' roles as sheriff's deputies is synonymous to the role of the firefighters in *Renfro* as they must also be alert and ready to protect their community to possibly even a greater extent than firefighters would. The BCSO, and citizens of Bibb County, predominately benefit from the deputies being on-call. Lastly, it should be noted that the fact that the plaintiffs in *Renfro* were not required to remain on their employer's premises did not impact the court's analysis.

For years the Plaintiffs and their loved ones have had to alter their daily way of living in order to conform with the requirements imposed by Defendant BCSO, Sheriff Davis, and Macon-Bibb County. The frequency of which the Plaintiffs are required to be on-call 24/7 means they resultingly spend a significant portion or their time technically off-duty at the beck and call of a potential call-out. This causes them constant anxiety and stress because they never know when they will have to drop everything and report to the call-out. The Plaintiffs' desire to be justly compensated for the time they spend on-call is fair and reasonable given the severe restrictions placed on them, the fact that their time spent on-call is predominately for the benefit of their employer, that they cannot effectively use their time in the ways they would otherwise like to, and based on the agreement made between all the parties that they will be compensated for such time.

**(D)      The Manual constitutes a contract between both Defendants and the Plaintiffs**

In Georgia, the essential elements of a breach of contract claim are (1) a valid contract; (2) material breach of its terms; and (3) damages arising therefrom.[110] Under Georgia law, to constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate.[111] An action for breach of contract requires breach of a valid contract and resultant damages to the party who has the right to complain about the breach.[112] The burden is on the plaintiff to show both the breach and the damage.[113]

In the case at bar, a contractual relationship exists between the Plaintiffs, Defendant BCSO, and Sheriff Davis based on the above referenced Manual. Courts have consistently held that employee handbooks can be considered a contract with respect to the employment benefits provided therein.[114] Additionally, it is accepted law of this State that "provisions in an employee manual relating to additional compensation plans, of which an employee is aware, may amount to a binding contract between the parties," as may "a promise of future compensation made at the beginning of the employment relationship."[115]

The *Ellison* court cited to three cases as examples of this principle of law:  the first case held that an employee handbook that contained a disclaimer almost identical to the one in the present case was a binding contract with respect to the employment benefits provided therein (payment of full salary if injured on the job) because it constituted an additional

---

110 *Brooks v. Branch Banking and Trust Co.*, 107 F. Supp. 3d 1290, 1295 (N.D. Ga. 2015).
111 O.C.G.A. §13-3-1.
112 *Kabir v. Statebridge Co., LLC*, 2011 WL 4500050, at *6 (N.D. Ga. 2011).
113 *Atlantech Inc. v. American Panel Corp.*, 743 F.3d 287, 292 (1st Cir. 2014).
114 *Fulton-Dekalb Hosp. Auth. v. Metzger*, 203 Ga. App. 595, 596 (1992) (See *Georgia Ports Auth. v. Rogers*, 173 Ga. App. 538, 327 S.E.2d 511 (1985)).
115 *Fletcher v. Amax, Inc.*, 160 Ga. App. 692, 693-694 (1981); *Ellison v. Dekalb Cnty.*, 236 Ga. App. 185, 186 (1999); *Shelnutt v. Mayor*, 333 Ga. App. 446 n.6 (2015) (distinguishing from *Tackett v. Georgia Dept. of Corrections*, 304 Ga. App. 310 (2010), "we interpret *Tackett* as holding that the permissive policy at issue in that case was more akin to policies setting forth certain procedures to be followed in connection with employment decisions than to policies providing for additional amounts or kinds of compensation.").

compensation plan offered by the employer and impliedly accepted by the employee at the time that employment relationship began.[116] In the second case, the court held that a plan for severance pay, offered by the employer and impliedly accepted by the employee, constituted a contract between them and was therefore not void based on the accepted law cited above regarding additional compensation plans.[117] In the third case, the court found that the employee had received the employees' handbook, which contained the employer's policy on vacation pay and how vacation is earned. Again, based on the law regarding employment benefits and additional compensation plans, the court held that the policies in that employee handbook constituted a part of the employee's contract of employment.[118]

The *Ellison* court explained that the reasoning in the three above-mentioned cases was that the employment benefits and/or additional compensation plan set forth in the manual represented an offer by the employer which the employee implicitly accepted by remaining in employment.[119] However, the Court also noted that not <u>all</u> provisions in employee manuals are to be considered binding agreements.[120] For example, the *Ellison* court noted that they had previously held that personnel manuals stating that employees can be terminated only for cause and setting forth termination procedures are not contracts of employment and that failure to follow the termination procedures contained in them is not actionable.[121] The reason why this case is synonymous to the *Shannon*, *Fletcher*, and *Metzger* cases is that the subject "on-call" provision constitutes an additional compensation plan or an employment benefit, not a condition of employment or violation thereof. The key takeaway from these cases is that a handbook can be a contract with respect to employment benefits provided therein, as we have

---

116 *Fulton*, 203 Ga. App. at 596.
117 *Fletcher*, 160 Ga. App. at 695.
118 *Shannon v. Huntley's Jiffy Stores, Inc.*, 174 Ga. App. 125, 126 (1985).
119 *Ellison*, 236 Ga. App. at 186.
120 *Id.*
121 *Id.*

here with the provision for payment of on-call time.   Payment on on-call time should be viewed no differently than other employment benefits, such as vacation pay, sick leave, payment of health insurance premiums and retirement benefits.

When Sheriff Davis exercised his option of electing coverage of policies in the Manual by which his deputies would be governed, this resulted in Sheriff Davis entering into a contract with Macon-Bibb County on behalf of his employees. The consideration for this agreement was that Macon-Bibb County would provide valuable services to the Sheriff's office/deputies, such as those outlined in the Manual, and in return, the deputies provide their own valuable services to Macon-Bibb County. A part of that contract included the provision for and calculation of on-call pay to be paid to the sheriff's deputies. At consolidation, Plaintiffs were required to review the Manual and sign off on it as part of their new employment with the County.[122] Even the investigators' supervisors testified that they were governed by the policies contained in the Manual.[123] Sheriff Davis signed that election form shortly after consolidation, thereby constituting the beginning of the employment relationship between Macon-Bibb County, Defendant BCSO, Sheriff Davis, and the sheriff's deputies, including Plaintiffs. Interestingly, the Plaintiffs' Lieutenant considers himself an employee of both Defendant BCSO and Macon-Bibb County, and testified that he is bound by the Macon-Bibb County Policies and Procedures.[124]

In addition to holding that promises of future compensation made at the beginning of the employment are enforceable, courts have also required that the promise be for an exact amount or based upon a "formula or method for determining the exact amount of the bonus."[125] The Manual in this case does exactly that. Specifically, it provides that

---

[122] Krage Dep. 57: 8-10; Renfroe Dep. 25: 22-25, 26: 1-5.
[123] Carmical Dep. 30: 5-6; Rutherford Dep. 38: 3-19; Clausen Dep. 28: 17-21; Williams Dep. 28: 17-22.
[124] Davis Dep. 47: 3-25.
[125] *Arby's v. Cooper*, 265 Ga. 240 (1995) (citing *Christensen v. Roberds of Atlanta, Inc.*, 189 Ga. App. 289 (1988)).

> [a]s compensation for the on-call time, the employee will be paid their regular hourly rate for two hours for each day on which he/she is on-call and four hours for each Saturday, Sunday or Holiday he/she is on-call regardless of whether he/she is actually required to respond to a call. On-call time is not time actually worked and will not be included when calculating overtime.

This method helps determine the exact way the employees' on-call pay will be calculated.

If it is determined that the Manual as a whole does not constitute a contract, this Court should at a minimum find that the provision regarding on-call pay creates a binding contract. Courts have allowed provisions in an employee manual relating to employment benefits and additional compensation plans to amount to a binding contract, reasoning that the additional compensation plan set forth in the manual represents an offer by the employer, which the employee implicitly accepts by remaining in employment.[126] The Manual's provision for payment of on-call time, which equates to an employee benefit or an additional compensation term, was offered to and impliedly accepted by the Plaintiffs and forms a binding contract under Georgia law.

Although the Manual contains boilerplate language disclaiming the creation of a contract, it also contains language stating that employees are expected to comply with the policies and procedures set forth in the Manual and that failure to do so could result in termination of employment. Defendant BCSO, Sheriff Davis, and Macon-Bibb County should not be permitted to force the Plaintiffs to abide by the Manual while simultaneously refusing to abide by their own representations and obligations within that same document. Therefore, if this Court finds that the terms within the Manual are contradictory and/or ambiguous, the Court should construe the terms against Macon-Bibb County as the drafter of the agreement.

---

126 *Ellison*, 236 Ga. App. at 186; *Fulton*, 203 Ga. App. at 596 (holding that "the policies in the employee handbook of which [appellee] was aware form[ed] a part of [his] contract for employment.").

Defendant County was in a superior bargaining position in that if Sheriff Davis did not elect to have his employees covered by the Manual, he would have no other means to obtain such resources. Construing the Manual against Defendant County warrants a finding that all parties intended to be bound by the Manual, and specifically the policy regarding payment of on-call time.

Furthermore, the *Johnson* case cited by Defendant BCSO in support of its contention that the Manual cannot serve to form the basis of a contract between the parties has substantial differences to the case at hand. First, in *Johnson*, the court found that the pertinent handbook did "not establish the specific and comprehensive terms of employment with the county," but "merely summarizes and acquaints employees with their rights, privileges, and obligations."[127] They further found that "[t]he specific rules actually governing employee rights (…) are found in the county personnel regulations, which implement the Civil Service Act" and that "[t]he handbook and the regulations expressly notify employees that they must consult the personnel regulations to be fully informed about their rights, privileges, and obligations."[128]

Here, the Manual is a standalone instrument that does not refer to any separate document that the employees should consult with regards to the substantive details of their employment. Instead, the Manual was intended to provide the employees with a summary of the rules and regulations governing their relationship with Defendant BCSO, Sheriff Davis, and Macon-Bibb County, as well as providing information on what is expected of them, and the standards by which their performance is evaluated.[129] Because the terms of the Manual in the present case are comprehensive, *Johnson* is distinguishable and fails to provide a helpful analysis in the present case..

---

127 *Johnson v. Fulton Cnty.*, 235 Ga. App. 277, 278 (1988).
128 *Id.*
129 Exhibit 4 to the Deposition of Justin Krage p. 6 ¶2.

## IV. CONCLUSION

Based upon the foregoing, Plaintiffs respectfully request this Honorable Court to
DENY Defendant BCSO's motion for summary judgment, and allow this case to proceed to
a jury.


Respectfully submitted, this 27th day of July 2021.

STEPHEN M. WELSH
Georgia Bar No. 747900
*Attorney for Plaintiffs*

**BUZZELL, WELSH & HILL, LLP**
200 Third Street
P. O. Box 1017
Macon, GA   31202-1017
Telephone:      (478) 742-8820
Facsimile:      (478) 742-3088
E-Mail:      swelsh@bwhlegal.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing PLAINTIFFS' BRIEF OPPOSING DEFENDANT BIBB COUNTY SHERIFF'S OFFICE'S MOTION FOR SUMMARY JUDGMENT was mailed first-class mail, postage prepaid, to attorneys for Macon-Bibb County:

Grant Greenwood, Esq.
Duke R. Groover, Esq.
Christopher R. Conley, Esq.
James-Bates-Brannan-Groover, LLP
231 Riverside Dr # 100
Macon, GA 31201
dgroover@jamesbatesllp.com
ggreenwood@jamesbatesllp.com
cconley@jamesbatesllp.com
*Attorneys for Macon-Bibb County, Georgia*

Dawn Maynard Lewis, Esq.
Virgil L. Adams, Esq.
Adams, Jordan & Herrington, P.C.
577 Mulberry St, Suite 1250
Macon, GA 31201
dlweis@adamsjordan.com
vadams@adamsjordan.com
*Attorneys for Defendant Bibb County Sheriff's Office*

This 27th day of July, 2021.

STEPHEN M. WELSH
Georgia Bar No. 747900
*Attorney for Plaintiffs*

**BUZZELL, WELSH & HILL, LLP**
200 Third Street
P.O. Box 1017
Macon, GA 31202-1017
(478) 742-8820
swelsh@bwhlegal.com